864 So.2d 590 (2003)
Byron Ellis TALBOT
v.
Bernice Ellen Harang TALBOT.
No. 2003-C-0814.
Supreme Court of Louisiana.
December 12, 2003.
Applications for Rehearing Denied February 6, 2004.
*593 Paul H. Lee, Robert C. Lowe, David C. Peltier, Suzette M. Smith, Lowe, Stein, Hoffman, Allweiss & Hauver, New Orleans, for applicant.
D. Douglas Howard, Jr., Danyelle M. Taylor, for respondent.
KNOLL, Justice.[*]
This writ concerns issues in a community property partition, the most important being the burden of proof necessary to overcome the presumption of community contained in La. Civ.Code article 2340. The parties in this matter were married in 1974 and subsequently divorced in 1997. In March 2000, the district court rendered a final judgment valuing and allocating the assets of the former community. The First Circuit Court of Appeal reversed several of the district court's findings, holding that the defendant failed to carry her burden of proof in establishing the Hibernia Bank and Bank One stocks and two certificates of deposit in her possession during the marriage were her separate property. The First Circuit also reversed the district court's ruling awarding the defendant ownership of the Great Southern Life Insurance Policy, which insured the plaintiff's life, and awarded the defendant a share in the cash surrender value of the policy.
We granted this writ to consider the burden of proof necessary to overcome the presumption of community and to further examine the allocation of ownership of a life insurance policy which insures the life of an ex-spouse. Talbot v. Talbot, 03-C-0814 (La.6/20/03), 847 So.2d 1247. For the following reasons we find the proper burden of proof in overcoming the presumption of community contained in La. Civ. Code article 2340 is a preponderance of the evidence. Thus, we reverse in part the court of appeal's determination that the defendant failed to carry her burden in establishing the separate nature of her Hibernia and Bank One bank stocks. In all other respects the court of appeal's decision is affirmed.

FACTS AND PROCEDURAL HISTORY
On September 27, 1974, Byron Talbot ("Mr.Talbot") and Bernice Harang ("Mrs.Talbot") were married, and three children were born of their marriage. During their marriage, the parties amassed an estate consisting of extensive amounts of property and ownership of various businesses. On March 20, 1997, Mr. Talbot filed a petition for divorce, joint custody,[1] partition of the community property, court costs, and attorney's fees. Mrs. Talbot answered the petition and filed for divorce in reconvention. On August 22, 1997, the district court rendered a judgment of divorce and terminated the community regime retroactively to the date Mr. Talbot filed his petition for divorce.
*594 The parties filed several preliminary detailed descriptive lists, and finally on October 27, 1998, the parties filed a joint detailed descriptive list.[2] The district court held a trial on the merits on October 26, 27, 28, and 29, and November 4, 5, 6, and 10 in 1998. During the trial, Mrs. Talbot and her two siblings, Mr. Ben Harang ("Mr.Harang") and Mrs. Sally Harang Naquin ("Mrs.Naquin"), testified as to the source of Mrs. Talbot's interest in the Hibernia and Bank One bank stocks and the funds, which comprise the two Hibernia CDs numbered 11140 and 11141 ("CDs"), respectively.
At the trial, all three siblings testified that they had received shares of stock in Citizens Bank and Trust Company from their grandfather, Harvey Peltier. Although Mr. Harang could not testify conclusively as to whether the stocks presently in Mrs. Talbot's possession were the stocks received from their grandfather, both Mrs. Talbot and Mrs. Naquin adamantly asserted that Mrs. Talbot inherited shares of stock in Citizens Bank and Trust Company and Raceland Bank and Trust Company from their grandfather when she was a young girl years before she was married. After a series of buyouts and mergers, the shares of Hibernia stock in question were a direct byproduct of those shares of Citizens Bank and Trust Company stock and the shares of Bank One stock were a direct byproducts of the Raceland Bank and Trust Company stock.[3] We note with significance that Mr. Talbot testified he was not aware that he and his wife ever bought Argent or Bank One stock during their marriage.
As to the funds comprising the CDs at issue, Mrs. Talbot explained that she received from her grandfather a 1/25 interest in Bay Drilling, a limited liability company. She received from her father an interest in two other limited liability companies, Tex-Emma and Cameco.[4] Her interests in these three companies were subsequently sold, and she placed the money she received from these sales in CDs, which she believed continuously "rolled over" and presently exist as the CDs at issue.[5]
*595 At the close of this eight-day trial, the district court appointed experts to conduct appraisals of the community's immovable property and businesses from which the experts were to provide the court with reports of their evaluations for its consideration. On March 30, 2000, the district court signed a final judgment valuing and allocating assets of the former community. In its judgment, the district court found:
That the certificates of deposit numbers 11140 and 11141 at Hibernia Bank are Bernice H. Talbot's separate property. This Court finds that Mrs. Talbot testified that she received these funds from her grandfather and received stock from her grandfather. Her separate property was sold and placed in certificates of deposit, that the fruits from the certificates of deposit were expended on community expenses, and that in fact, the certificates of deposit are less than the total amount she received from her grandfather. Accordingly, this Court found clear and convincing evidence that these certificates of deposit are Bernice H. Talbot's separate property. The only evidence that the Court had before it is that they are her separate property. The testimony of Mrs. Talbot stated that they were her separate property, and the testimony of her sister that she received similar amounts and the other grandchildren received the same amount was unrefuted.
The district court also held "that the Argent Bank stock and the Bank One stock are Bernice H. Talbot's separate property" and transferred the ownership of the Great Southern Life policy number 1822260 to Mrs. Talbot at a value of $48,485.
On appeal to the First Circuit, the parties asserted fourteen assignments of error. Applying the clear and convincing standard of proof, the First Circuit held that "the record demonstrates that [Mrs. Talbot] failed to establish the separate nature of the CDs, to prove the CDs were purchased with her separate funds, and to furnish evidence that the CDs had been `rolled over' from term to term." Accordingly, the court of appeal found that Mrs. Talbot failed to sustain her burden of overcoming the presumption that the funds contained in the CDs were community. Applying the "best evidence" rule and the clear and convincing standard of proof, the First Circuit also found that the district court erred in accepting parol evidence to sustain Mrs. Talbot's burden of proof that the Bank One stock certificates P178497 and 1252643 were her separate property. On rehearing, the First Circuit amended *596 its ruling on the bank stocks to include the Citizens Bank and Trust Company and Argent Bank stock, designating all the bank stocks as community property.
In addition, on original hearing, the First Circuit reversed the district court's allocation of ownership of the Great Southern Life insurance policy number 1822260, which insured Mr. Talbot's life, to Mrs. Talbot, finding that the community asset in question in this case was the cash surrender value of the policy, and not the ownership of the policy, and awarded Mrs. Talbot a share in the cash surrender value of the policy.

LAW AND ANALYSIS
Although marriage is designated a civil contract under La. Civ.Code article 86, "it is more than a contract." Holliday v. Holliday, 358 So.2d 618, 619 (La.1978). "The law prescribes the manner of contracting and celebrating marriages, the legal effects and consequences of marriage, and the manner in which marriages may be dissolved." Id. Accordingly, "marriage is a relationship established according to law and it is the policy of the state to maintain it." Id. In the public interest, the state has deemed that "the legal regime of community of acquets and gains applies to spouses domiciled in this state." La. Civ.Code art. 2334 (2003).
In Succession of Lyons, 452 So.2d 1161, 1165 (La.1984), this Court stated that "persons attempting to overcome the presumption of community property status ... must ... satisfy this intermediate level of proof," referring to the clear and convincing standard. Lyons, 452 So.2d at 1165. However, in making this statement, the court reproduced article 2340 and cited two cases: R.D.M. Corp. v. Patterson, 255 La. 301, 230 So.2d 820 (1970) and Succession of Hemenway, 228 La. 572, 83 So.2d 377 (1955). Both cases relied upon by the Court predated the 1979 revision of Book III, Title IV of the Civil Code.
In Tullier v. Tullier, 464 So.2d 278 (La. 1985), this Court upheld the retroactive application of La. Civ.Code art. 2340 without comment as to the presumption and the burden of proof necessary to rebut the presumption of community under the new codal provisions. Tullier, 464 So.2d at 282. The Tullier court merely described the presumption as "a strong presumption in favor of the community." Id. at 283.
Repeatedly, the lower courts have relied upon pre-revision case law in applying the clear and convincing standard of proof,[6] but the leading authorities in this area of law are critical of this practice and advocate the application of the lower preponderance of the evidence standard. See Katherine S. Spaht & W. Lee Hargrave, 16 Louisiana Civil Law Treatise, Matrimonial Regimes § 4.8, at 207-08 (2nd ed.1997).
This court has yet to examine whether it is necessary to rebut the presumption of community in article 2340 as to "things in the possession of a spouse during the existence of a regime of community" by the heightened burden of clear and convincing proof. With the 1979 revisions of the community property laws doing away with the *597 necessity for strict proof of paraphernality and the double declaration rule, the burden of proof necessary to rebut the community presumption is squarely before us in this case.

Presumption of Community
Louisiana Civil Code Article 2340 provides:
Things in the possession of a spouse during the existence of a regime of community of acquets and gains are presumed to be community, but either spouse may prove that they are separate property.
La. Civ.Code art. 2340 (2003). Enacted by 1979 La. Acts 709,[7] article 2340 broadened the reach of the community presumption previously contained in La. Civ.Code article 2405[8] to apply to all property possessed by either spouse during the community regime. See Matrimonial Regimes  The Work of the Louisiana Legislature for the 1978 Regular Session: Private Law, 39 La. L.Rev. 129, 141 (1978-1979).[9] Obviously favoring the community, this article strengthens the regime through its broader language.
Presently, the presumption applies to all property possessed by either spouse during the community regimeregardless of the time of acquisition. Matrimonial Regimes, supra, at 142. This includes "even separate property acquired before the establishment of the regime, and if the character of any property is contested, the spouse claiming separate ownership of the property will have the burden of proving its separate character." Id. at 142.
Clearly, the revised community presumption has the potential for unfairness, especially in situations where prior to entering the community regime one spouse acquires property either through donations or independent purchases. Under the new regime, that property is presumed community, and the donee or purchaser spouse has to prove the separate nature of the property he or she brought into the community. La. Civ.Code article 2340 subjects property, which is clearly separate property at the time of its acquisition and prior to marriage, to a community classification potentially effecting a legal change in the nature of the property upon marriage.
Moreover, as evident in this case, the legal presumption creates the possibility and the potentiality that a spouse will be called upon to establish the source or origin of property that may have been acquired years before the marriage and potentially *598 decades before the termination of the community regime. Because this expanded community presumption does have this potential for unfairness, the presumption was made clearly rebuttable. Matrimonial Regimes, supra, at 142.

Burden of Proof
"A `presumption' is an inference created by the legislature that the trier of fact must draw if it finds the existence of the predicate fact unless the trier of fact is persuaded by evidence of the nonexistence of the fact to be inferred." La.Code Evid. art. 302(3) (2003). Article 302(1) of the Louisiana Code of Evidence provides that "the `burden of persuasion'[10] is the burden of a party to establish a requisite degree of belief in the mind of the trier of fact as to the existence or nonexistence of a fact." La.Code Evid. art. 302(1) (2003). "Depending on the circumstances, the degree of belief may be by a preponderance of the evidence, by clear and convincing evidence, or as otherwise required by law." Id. Article 2340, however, does not provide the level of proof or persuasion necessary to overcome the presumption of community.
In civil cases, a party who has the burden of proof must prove the fact in issue by a preponderance of the evidence, and not by some artificially created greater standard. Lasha v. Olin Corp., 625 So.2d 1002, 1005 (La.1993); Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151, 155 (1971); McCormick on Evidence § 339, at 421 (5th ed.1999). Only in exceptional controversies is the clear and convincing standard applied in civil cases "where there is thought to be special danger of deception, or where the court considers that the particular type of claim should be disfavored on policy." McCormick, supra, at 421; Succession of Lyons, 452 So.2d at 1165. The clear and convincing standard requires a party to prove the existence of a contested fact is highly probable, or much more probable than its non-existence. McCormick, supra, at 421; Succession of Lyons, 452 So.2d at 1165.
Through the years, however, the lower courts have repeated the formula of Prince v. Hopson, 230 La. 575, 89 So.2d 128 (1956), requiring a spouse to prove the separate nature of his or her property by a "strict, clear, positive and legally certain" standard, or stated more traditionally, the clear and convincing standard. See Succession of Broussard, 306 So.2d 399, 403 (La.App. 3d Cir.1975) (setting forth the clear and convincing standard). See, e.g., Knighten v. Knighten, 00-1662 (La.App. 1 Cir. 9/28/01), 809 So.2d 324, 331, writ denied, 01-2846 (La.1/14/02), 805 So.2d 207; Barrow v. Barrow, 27,714 (La.App. 2 Cir. 2/28/96), 669 So.2d 622, 624, writ denied, 96-1057, 96-1072 (La.6/21/96), 675 So.2d 1080; Hinckley v. Hinckley, 583 So.2d 125, 127 (La.App. 4th Cir.1991), writ denied, 590 So.2d 64 (La.1991); Morris v. Morris, 96-788 (La.App. 3 Cir. 12/26/96), 685 So.2d 673, 674, writ denied, 97-0237 (La.3/14/97), 690 So.2d 40; Succession of Lyons, 452 So.2d 1161, 1165 (La.1984). All the cases that purport to impose this intermediate standard of proof rely on a standard that reverts to a time when the courts required strict proof of paraphernality and when the double declaration rule was in effect. Spaht & Hargrave, supra, at 209.
Under the strict proof of paraphernality doctrine, a wife could only overcome the presumption of community by satisfying a triple burden of proof showing "(1) that the funds constituting the price paid for *599 the property were paraphernal funds, (2) that they were administered by her, and (3) that they were invested by her." Prince, 89 So.2d at 130-31. In Curtis v. Curtis, this Court abandoned these strict elements of proof in a case involving a wife's credit sale. Curtis, 403 So.2d 56, 58 (La.1981); see also, K. Spaht, Developments in the Law, 1980-1981  Matrimonial Regimes, 42 La. L.Rev. 347, 363-73 (1982); Spaht & Hargrave, supra, at 208, n. 3.
The double declaration rule provided that when a husband acquired property during the existence of the community regime, a presumption of community existed, which could not be rebutted unless in the act of acquisition, there was "a double declaration that the property was acquired with funds belonging to the husband separately and that it was being acquired for his individual estate." Tullier, 464 So.2d at 281; see also, Wood v. Wood, 424 So.2d 1143 (La.App. 1st Cir.1982). Through the enactment of article 2340, the Legislature abolished the double declaration rule. La. Civ.Code art. 2340, cmt. (b); Tullier, 464 So.2d at 281. This abolition "reflects a policy of greater flexibility." Spaht & Hargrave, supra, at 209.
An examination of the history of the "strict, clear, positive and legally certain" or the clear and convincing standard of proof reveals that this higher standard apparently evolved in conjunction with the rules requiring strict proof of paraphernality and the double declaration rule, which created a conclusive presumption of community if the husband could not establish evidence of the existence of a double declaration in the act of acquisition. See Tullier, 464 So.2d at 281; Spaht & Hargrave, supra, at 208-09. With the abolition of the double declaration rule, the Legislature sought to allow for more flexibility in the community presumption and the level of persuasion necessary to rebut that presumption.
With the 1979 revisions of the community property regime, we find it difficult now to discern the basic policies which necessitate a higher than normal level of proof. We quote with approval, the comments of Spaht and Hargrave, leading authorities in this area of law:
A suggestion in passing that it involves "the sanctity of the family" may be proper in evaluating the presumption that the husband of the mother is the father of the child, but that does not directly extend to the classification of property as community or separate. Basic fairness does not seem to require the high level, for the law allows the spouses to enter into a separate regime in which no community property exists. Judicial efficiency would not seem to demand the higher burden. Perhaps there does exist a basic policy in favor of the community classification to promote sharing, but it would seem that the presumption itself satisfied that policy. Also, the simple preponderance of the evidence standard applied regularly in civil cases is the norm unless something higher is called for, and no statute calls for a higher level of proof here.
Spaht & Hargrave, supra, at 209-10.
Given the broadened community presumption of the revision, imposing the prior burden of proof by clear and convincing evidence will render near impossible the ability of some spouses to prove the separate nature of property acquired, as in this case, years before the establishment of the regime and decades before its termination. During that broad expanse of time, records are lost, destroyed, and possibly even stolen, and to satisfy this burden of proof, a spouse will potentially need to keep evidence of every donation and gift received and purchase and transfer made dating *600 back years before marriage, even as in this case into childhood. This is an impractical and unwieldy burden, which the Legislature and the Law Institute did not intend through their revision of the community presumption. See Spaht & Hargrave, supra; Matrimonial Regimes, supra.
As a matter of public policy and in the interest of fairness, we find that the community presumption contained in article 2340 is rebuttable by either spouse upon a showing by a preponderance of the evidence the separate nature of property brought into the community.

Classification of the Bank Stocks
We will now examine the record evidence to determine whether Mrs. Talbot established by a preponderance of the evidence the separate nature of her bank stocks. "Proof is sufficient to constitute a preponderance when the entirety of the evidence, both direct and circumstantial, establishes that the fact or causation sought to be proved is more probable than not." Cay v. State Dept. of Transp. and Development, 93-0887 (La.1/14/94), 631 So.2d 393, 395; see also, Boudreaux v. American Ins. Co., 262 La. 721, 264 So.2d 621 (1972).
At trial, Mrs. Talbot presented the only evidence establishing the ownership and origins of the Hibernia and Bank One stocks. She introduced into evidence stock certificates certifying that she was the registered holder of the stocks at issue [11] and testified that she received all the stocks in question from her grandfather, Harvey Peltier, when she was a young girl, many years before her marriage. Her sister, Mrs. Naquin also testified that the stocks presently owned by Mrs. Talbot were the stocks donated to Mrs. Talbot by their grandfather, Harvey Peltier, and that as an employee of one of the banks at issue she would have been in the position to know if her sister had purchased any other bank stocks. Mr. Harang, Mrs. Talbot's brother, testified that he also received stocks from their grandfather. Finally, *601 Mr. Talbot testified that he was not aware that he or his wife ever purchased bank stocks during their marriage, and significantly his attorneys did not cross-examine Mrs. Talbot regarding the bank stocks. The record shows, the separate nature of this property was unrefuted and that was the trial court's finding.
"If the trier of fact finds the existence of the predicate fact, and if there is evidence controverting the fact to be inferred, it shall find the existence of the inferred fact unless it is persuaded by the controverting evidence of the nonexistence of the inferred fact." La.Code Evid. art. 306 (2003). In this case, the district court held that the stocks were Mrs. Talbot's separate property. Although it is not clear from the record what burden of persuasion the court imposed, the preponderance of the evidence standard is the lowest burden of persuasion. See McCormick, supra, at 402. For the court to have concluded that Mrs. Talbot established the separate nature of the stocks, the court must also have found that Mrs. Talbot satisfied at least this lowest burden of proof.
The court of appeal held that "the `best evidence' rule would have required Bernice to produce a copy of the act of donation, where her grandfather donated the stock to her or the judgment of possession from her grandfather's succession to prove the stock was actually donated or inherit," Talbot v. Talbot, 00-2650, p. 8, 836 So.2d 704 (11/20/02) (Table). In the interest of fairness, we do not impose such a burden. We find allowances must be made when an acquisition occurred many years before a claim is asserted, especially in the circumstances of this case where Mr. Talbot did not refute the claim. Southwest Natural Prod. Co. v. Anderson, 239 La. 490, 118 So.2d 897, 900 (1960); Lee v. Manning, 505 So.2d 902, 904 (La.App. 2d Cir.1987).
Moreover, the transfer or donation of stocks are not subject to the Civil Code's strict form requirements. Primeaux v. Libersat, 322 So.2d 147, 151(La.1975). If a stock share is validly transferred by reason of the stock-transfer legislation, which inter alia permits shares to be transferred without consideration paid to the transferor, La. R.S. 12:624, 629(4), its transfer is valid as a donation without the necessity of the additional formality of a notarial act. Primeaux, 322 So.2d at 151 (citing Succession of McGuire, 151 La. 514, 92 So. 40 (1922); Poole v. Poole, 270 So.2d 218 (La.App. 1st Cir. 1972) (syllabus 1); Succession of Hall, 198 So.2d 511 (La.App. 2d Cir.1967), certiorari denied, 250 La. 974, 200 So.2d 664 (1967); LeBlanc v. Volker, 198 So. 398 (La.App. Orl.1940)).
Stocks may be donated by a valid transfer made in accordance with stock-transfer legislation or commercial law. Primeaux, 322 So.2d at 151.[12] In this case, the certificates that would have been received by Mrs. Talbot and may have revealed the donative intent of the donor have been subject to buyouts and mergers and possibly surrendered, canceled, and reissued as certificates of the acquiring bank's stock. See Primeaux, 322 So.2d at 150. In her brief to this Court, Mrs. Talbot explained that the banks that purchased the original banks in which her *602 grandfather had given her stocks issued her new stock in the purchasing banks during the existence of the community regime, replacing the original certificates.
Under Louisiana law, the trial court is granted broad discretion in determining the admissibility of parol evidence. Hoerner v. ANCO Insulations, Inc., 00-2333, p. 38 (La.App. 4 Cir. 1/23/02), 812 So.2d 45, 71, writ denied, 02-0935, 02-0965, 02-0967 (6/21/02), 819 So.2d 1023, and writ denied, 02-0972 (La.6/21/02), 819 So.2d 1024; Dardeau v. Ardoin, 97-144, p. 5 (La.App. 3 Cir. 11/5/97), 703 So.2d 695, 697, writ denied, 98-0359 (La.3/27/98), 716 So.2d 889. Courts are to resolve the admissibility of evidence in favor of receiving the evidence. Dardeau, 703 So.2d at 697; Lemoine v. Hessmer Nursing Home, 94-836 (La.App. 3 Cir. 3/1/95), 651 So.2d 444, 451. Under the circumstances in this case, we find the trial court did not abuse its discretion in accepting Mrs. Talbot's and her siblings' parol testimony to sustain her burden of proof. Accordingly, we reverse the appellate court's ruling on the bank stock and reinstate the judgment of the district court, finding Mrs. Talbot established the separate nature of the stocks.

Classification of the CDs
Classification of the CDs in this case presents a more problematic issue primarily because the CDs in question are composed of commingled separate and community funds. We have stated in cases involving bank accounts that the mere mixing of separate funds and community funds in the same account does not of itself convert an entire account into community property. Curtis v. Curtis, 403 So.2d 56, 59-60 (La.1981); Graves v. United States Rubber Co., 237 La. 505, 111 So.2d 752, 755 (1959). Only when separate funds are commingled with community funds indiscriminately so that the separate funds cannot be identified or differentiated from the community funds are all the funds characterized as community funds. Curtis, 403 So.2d at 59-60; Graves, 111 So.2d at 755. Where separate funds can be traced with sufficient certainty to establish the separate ownership of property paid for with those funds, the separate status of such property will be upheld. Curtis, 403 So.2d at 59-60; Graves, 111 So.2d at 755.
The considerations for establishing the burden of proof in rebutting the presumption of community for property brought into the community are the same when the separate property is commingled with community property. Untangling the web of separate and community interests requires tracing the interests involved to their original identities which is strictly a matter of proof. Typically, evidence which traces the original ownership interest is fairly conclusive proof of the issue. Notwithstanding this fact, this does not in and of itself elevate the burden of proof to the clear and convincing standard in resolving the issue of commingled interests. By the very nature of untangling the web of commingled interests by tracing with sufficient certainty, this preponderates the ownership interest. Analogously, we note with interest that in a disavowal action, the husband can only satisfy his burden of proof by a preponderance of the evidence through the production of facts susceptible of independent verification or corroborative evidence, e.g. scientific data. See La. Civ.Code art. 187 (2003).
The separate nature of the property commingled must be identifiable or differentiated, or else it loses its separate nature and falls into the community regime. When the separate property is commingled, the issue of the separate nature of the property is called into question *603 by the very act of commingling the property. Thus we find once the spouse allows those separate funds to be commingled with community funds, the spouse still must meet the burden of proof by a preponderance of the evidence to demonstrate the separate ownership of property purchased with the commingled funds, but to satisfy this burden the spouse must trace with sufficient certainty the separate nature of the funds used to purchase the property. See Curtis, 403 So.2d at 59-60; Graves, 111 So.2d at 755. Only where separate funds can be traced with sufficient certainty will a spouse be able to satisfy his or her burden of proof. Curtis, 403 So.2d at 59-60; Graves, 111 So.2d at 755.
Mrs. Talbot can establish by a preponderance of the evidence the initial CDs were purchased with her separate funds received from the sale of her interests in Tex-Emma, Cameco, and Bay Drilling as evidenced by her check ledgers and her testimony. Notably, Mr. Talbot did not contest the separate nature of Mrs. Talbot's interests in these three companies or the funds acquired through the sales of her interests. The record shows the separate nature of this property was not refuted.
Notwithstanding this finding, we do not find Mrs. Talbot has traced with sufficient certainty those separate funds to establish the separate ownership of the CDs in question. Mrs. Talbot testified that when the original CDs reached maturity she allowed the CDs to "roll over" into new CDs. She further testified she "believed" this was a continuous practice she employed with all the CDs. As the appellate court stated, Mrs. Talbot "failed to prove that a portion of the interest derived from these CDs was not `rolled over' into the subsequently purchased CDs, which under Civil Code article 2399 constitutes community property, because those funds are fruits of the CDs." Talbot, 00-2650 at p. 7. In allowing the CDs to continuously roll over, it appears Mrs. Talbot effectively commingled the principle of the CDs and the interest accrued on the CDs, which is community property. By engaging in this practice, Mrs. Talbot is now required to untangle the web of community and separate funds she created to establish the separate ownership of the CDs in question.
The only evidence Mrs. Talbot presented at trial were check ledgers and check stubs from the mid-1970s. The record is devoid of any evidence tracing the funds composing the CDs for over twenty years. The identity of these CDs was proven by mere assumption when Mrs. Talbot could have produced bank records of the CDs, but she failed to do so. Although Mrs. Talbot argues Mr. Talbot failed to subpoena the relevant bank records after the trial court gave him the authority to do so, the law places the burden upon the party asserting the separate nature of the property to prove the separate ownership of the CDs. Tullier, 464 So.2d at 283. This burden was Mrs. Talbot's to carry.
In sum, when separate and community funds are commingled, a spouse endeavoring to overcome the presumption of community can establish by a preponderance of the evidence the separate nature of property bought with commingled funds by tracing his or her separate funds with sufficient certainty. In the absence of documentation tracing the funds currently comprising the CDs in question, we find Mrs. Talbot did not successfully prove the separate ownership of the CDs by a preponderance of the evidence. Accordingly, we affirm the conclusion reached by the appellate court, finding that the CDs are *604 community property.[13]

Great Southern Life Insurance Policy
Under Louisiana law, life insurance policies are treated as unique contracts governed by their own rules rather than by the Civil Code. Spaht & Hargrave, supra § 3.32, at 122; see generally, Comment, Insurance and the Community, 25 La. L.Rev. 492 (1965); Nabors, Civil Law Influences Upon the Law of Insurance in Louisiana, 6 Tul. L.Rev. 369 (1932). According to the rules of privity of contract, "the contracting spouse is the sole manager of the contractual rights that are provided under the policy." Spaht & Hargrave, supra § 3.32, at 124 (referencing S. Mckenzie & H. Johnson, 15 Louisiana Civil Law Treatise, Insurance Law and Practice, § 263, n. 19 (West 1986)); Pollock v. Pollock, 164 La. 1077, 115 So. 275, 276 (1928). In principle, contracts produce effects as between the contracting parties only. La. Civ.Code art. 2346, cmt. (b) (2003).
Upon termination of the community, a life insurance policy purchased with community funds during the community is "a co-owned asset subject to partition by the co-owners." Spaht & Hargrave, supra § 3.32, at 125; La. Civ.Code art. 2336 (2003); see also, T.L. James & Co., Inc. v. Montgomery, 332 So.2d 834 (La.1975). Under the privity principle, the policy should be awarded to the owner of the policy, with the other spouse receiving property of an equal value. Spaht & Hargrave, supra § 3.32, at 125. To provide otherwise would interfere with the contractual relationship between the insurer and the owner of record.
In this case, the parties do not dispute that the Great Southern Life Insurance policy is community property, nor is it disputed that Mr. Talbot is the owner of the policy. As community property upon termination, the life insurance policy became a co-owned asset subject to partition by the co-owners. In accordance with the privity principle, the community asset must be partitioned allowing Mr. Talbot to retain ownership of the policy, with Mrs. Talbot receiving property of an equal value.
Based upon the economic situation of the parties and the division of other property at issue in the case, we find that the court of appeal correctly awarded Mrs. Talbot a share in the cash surrender value of the policy. Accordingly, we affirm the court of appeal's judgment reversing the trial court's award of the ownership of the Great Southern Life Insurance policy number 1822260 to Mr. Talbot and awarding a share in the cash surrender value of the Great Southern Life Insurance policy to Mrs. Talbot.

DECREE
For the foregoing reasons, we reverse the court of appeal's judgment on the community nature of the Hibernia and Bank One bank stocks and reinstate the district court's judgment. On all other issues, the court of appeal is affirmed.
REVERSED IN PART OTHERWISE AFFIRMED.
TRAYLOR and HIGHTOWER, JJ., concur in part and dissent in part and assign reasons.
JOHNSON, J., concurs in part and dissents in part for reasons assigned by TRAYLOR, J.
*605 TRAYLOR, J., dissenting in part, concurring in part.
I respectfully dissent in part and concur in part. I disagree with the majority decision to lower the burden of proof necessary to overcome the La. Civ.Code art. 2340 presumption of community property. Although the majority relies extensively on pre-revision jurisprudence as a basis for changing the burden of proof, I am unpersuaded by this argument. By the time the 1979 revisions were passed, the law regarding the burden of proof necessary to overcome the presumption of community property was well-established. See, Prince v. Hopson, 230 La. 575, 89 So.2d 128 (1956); Succession of Smith, 247 La. 921, 175 So.2d 269 (1965); Succession of Lyons, 452 So.2d 1161 (La.1984). The legislature was certainly aware of this law and could have statutorily changed the burden of proof necessary for a rebuttal, yet it did not address the situation.
In addition, I am unconvinced that the repeal of the double declaration and strict proof of parphernality requirements serve as evidence of the legislature's intent to lower the burden of proof. With regard to the double declaration rule, the legislature simply repealed a law which, by this court's acknowledgment, was arbitrary and offered little insight into the determination of whether immovable property was in fact separate property.[1] The "greater flexibility" provided by the repeal of the double declaration rule did not change the burden of proof, but rather allowed for alternative avenues to prove that immovable property is separate under the clear and convincing standard. Likewise, the strict proof of paraphernality requirement was eliminated as a recognition that rules which may have produced a just result under the head-and-master community regime do not necessarily do so when conditions change. Curtis v. Curtis, 403 So.2d 56, 58 (La. 1981). It does not follow that a the legislature's repeal of certain types of proof which provided arbitrary results requires a lower burden of proof.
Furthermore, strong policy considerations support the use of the clear and convincing standard. The clear and convincing standard is usually employed "where there is thought to be special danger of deception, or where the court considers that the particular type of claim should be disfavored on public policy grounds." Lyons, 452 So.2d at 1165 (quoting McCormick on Evidence, § 340(b), p. 798 (2nd ed.1972)). The rebuttable presumption of community property falls under an exceptional controversy which requires the "strict, clear, positive and legally certain" or the clear and convincing standard. The ease with which the parties may claim lost documents combined with the emotionally charged, intensely personal nature of these proceedings give ample opportunity for deception.
Applying the clear and convincing standard to the case sub judice, Mrs. Talbot has failed to prove the bank stocks are her separate property. The "clear and convincing" standard is a heavier burden of proof than the usual civil case standard of "preponderance of the evidence" but is *606 less burdensome than the "beyond a reasonable doubt" standard of a criminal prosecution. Lyons, 452 So.2d at 1165; Chatelain v. State, Department of Transportation and Development, 586 So.2d 1373, 1378 (La.1991). Although I acknowledge that transfer or donation of stocks are not subject to the Civil Code's strict form requirements in accordance with Primeaux v. Libersat, 322 So.2d 147, 151 (La. 1975), no evidence reveals that Mrs. Talbot received the stocks in the form provided for donation of stocks. Moreover, I do not believe that Mrs. Talbot's failure to keep records of this event excuses her from producing evidence on this issue. Her possession of the stock, standing alone, does not prove that the stock was in fact transferred to her as the result of an inheritance. Mrs. Talbot could have furnished the trial court with a judgment of possession from her grandfather's estate, which would have established a date of acquisition. Instead, she provided the circumstantial testimony of her brother and sister, which under La. R.S. 12:603 would not serve as evidence for a corporation to transfer stock from the record owner to an heir.[2] Moreover, Mrs. Talbot failed to prove the date of acquisition of stock through her sister's testimony that Citizen's Bank and Trust Company had merged with other banks. I find it incredible that Mrs. Talbot could not produce bank records regarding the various mergers and therefore trace her stock to the date of acquisition.
Accordingly, I respectfully concur in the majority's ultimate decision concerning the life insurance policy and the classification of the certificates of deposit as community property. With regard to the lowering of the standard of proof, however, I respectfully dissent and would maintain the clear and convincing standard for both commingled and non-commingled property. Accordingly, I would find that the bank stocks are community property.
HIGHTOWER, J. ad hoc, concurring in part and dissenting in part.
I likewise concur in the rationale of the opinion concerning the life insurance policy and the majority's concluding classification of the CDs. In reference to the lowering of the standard of proof, however, I respectfully dissent and would essentially join with Justice Traylor to affirm the court of appeal's designation of the bank stock as community property.
NOTES
[*] Retired Judge Lemmie O. Hightower, assigned as Justice ad hoc, sitting in place of Justice John L. Weimer, recused.
[1] At the time Mr. Talbot filed his petition for divorce, one of the three children was still a minor.
[2] In the joint detailed descriptive list ("list"), the parties stipulated that the two CDs in question, Hibernia # 11140 and Hibernia # 11141, were community property. The list at number 67 and 68 set forth claims for reimbursement of funds from "sale of separate property deposited into Argent # 5355123 during marriage and used for the benefit of community ... sale of separate property deposited into Argent # 5355805 during marriage and used for the benefit of the community." The amounts of the reimbursement requests were $153,338 and $28,450, respectively. The parties at number 23 and 24 on the list stipulated to the number of shares owned, 5,120 shares Argent Bank stock and 18 shares BancOne stock, but not to the character of the stocks. As for the Great Southern Life Policy # 1822260, the parties stipulate that "[Mrs. Talbot]accumulated value" and "[Mr. Talbot]surrender value," but they did not agree as to the appropriate values.
[3] Mrs. Naquin testified at trial as to the history of Citizens Bank and Trust Company: "It started as Citizens Bank and Trust Company... [after Citizens] [i]t became First Interstate. After First Interstate it became Argent Bank, and then Hibernia purchased Argent Bank." The bank also merged with Lafourche National at some point.
[4] The record does not provide the date on which the interests in these three companies were donated to Mrs. Talbot.
[5] Mrs. Talbot testified that she received $93,392 from her interest in Tex-Emma and "with some fruits of my inheritance," she accumulated $100,000, which on May 20, 1975, she invested in a CD for $100,000 in Citizens Bank. On March 22, 1976 the CD matured, and on May 10, 1976, the CD was "put back into the bank." Once the second CD matured, Mrs. Talbot testified that "[i]t's just rolled over, and that's one of my CDs as is today ... Hibernia Bank number 11141." Mrs. Talbot also testified that she received $5,465.86 from the sale of her interest in Tex-Emma and she spent that money on household expenses, which she verified with checks issued to satisfy household bills and accounts. Mrs. Talbot received $129,819 from the sale of her interest in Bay Drilling. She used $100,000 of that amount to purchase a CD for $100,000 on January 16, 1978, evidenced by a check stub that said "on January 16, 1978, pay to Citizens Bank and Trust Company a CD for 91 days for $100,000." She further testified she believed that around $10,000 from the CD were used to pay bills and that the remaining $90,000 were used to purchase another CD, "which is now in Hibernia Bank for $90,000." On July 22, 1987, Mrs. Talbot deposited $78,000 from the sale of her interest in Cameco, which she used to purchase a CD. On cross-examination, Mrs. Talbot testified that she did not have any records tracing the funds from the original CDs. Mrs. Talbot did produce copies of her checkbook ledger where she made notations and provided the dates she deposited the funds received from the sale of her interests in the three companies. Those dates do correspond to the purchase dates of the original CDs. As for tracing the funds, however, she testified she believed that the original CDs continuously "rolled over" into the CDs in question, but the record is devoid of objective proof that this is what occurred.
[6] See Succession of Broussard, 306 So.2d 399, 403 (La.App. 3d Cir. 1975) (setting forth the clear and convincing standard). See, e.g., Knighten v. Knighten, 00-1662 (La.App. 1 Cir. 9/28/01), 809 So.2d 324, 331, writ denied, 01-2846 (La. 1/14/02), 805 So.2d 207; Barrow v. Barrow, 27,714 (La.App. 2 Cir. 2/28/96), 669 So.2d 622, 624, writ denied, 96-1057, 96-1072 (La.6/21/96), 675 So.2d 1080; Hinckley v. Hinckley, 583 So.2d 125, 127 (La.App. 4th Cir.1991), writ denied, 590 So.2d 64 (La. 1991); Morris v. Morris, 96-788 (La.App. 3 Cir. 12/26/96), 685 So.2d 673, 674, writ denied, 97-0237 (La.3/14/97), 690 So.2d 40; Succession of Lyons, 452 So.2d 1161, 1165 (La.1984).
[7] Through this act, Louisiana's community property regime was overhauled, its head and master system of management was abolished, and the current system of equal management was created. See Katherine S. Spaht, Background of Matrimonial Regimes Revision, 39 La. L.Rev. 323, 340-41 (1978-1979).
[8] La. C.C. art. 2405 provided:

At the time of dissolution of the marriage, all effects which both husband and wife reciprocally possess, are presumed common effects or gains, unless it be satisfactorily proved which of such effects they brought in marriage, or which have been given them separately, or which they have respectively inherited.
La. Civ.Code art. 2405 (West 1950).
[9] This article discusses the changes to article 2405 by 1978 La. Acts 627. "The presumption that property possessed during the marriage is community and the ability of the spouses to rebut that presumption with evidence to the contrary were unchanged by article 2340 of Act 709." Katherine S. Spaht and Cynthia Samuel, Equal Management Revisited: 1979 Legislative Modifications of the 1978 Matrimonial Regimes Law, 40 La. L.Rev. 83, 113 (1979-1980). The authors explained Act 627 served as a trial run for the community regime reform and Act 709 revised Act 627, but the provisions of Act 627 establishing the presumption of community remained untouched by Act 709's revision. Id.
[10] The term "burden of proof" is generally used to encompass the burden of persuasion and the burden of producing evidence, which is the "lesser burden of a party to come forward with evidence sufficient to avoid a directed verdict." La.Code Evid. art. 302, cmt. (b). Throughout this opinion, the term burden of proof is used in this manner.
[11] The stock certificates presented: (1) Citizens Bank & Trust Company, Thibodaux, Louisiana # 12123, Shares 2, Registered holder: Bernice Harang Talbot, Date 09/08/86; (2) Citizens Bank & Trust Company, Thibodaux, Louisiana # 12124, Shares 2, Registered holder: Bernice Harang Talbot, Date 09/08/86; (3) Citizens Bank & Trust Company, Thibodaux, Louisiana # 12125, Shares 2, Registered holder: Bernice Harang Talbot, Date 09/08/86; (4) Citizens Bank & Trust Company, Thibodaux, Louisiana # 12126, Shares 10, Registered holder: Bernice Harang Talbot, Date 09/08/86; (5) Citizens Bank & Trust Company, Thibodaux, Louisiana # 12129, Shares 512, Registered holder: Bernice Harang Talbot, Date 09/08/86; (6) Citizens Bank & Trust Company, Thibodaux, Louisiana # 12127, Shares 16, Registered holder: Bernice Harang Talbot, Date 09/08/86; (7) Citizens Bank & Trust Company, Thibodaux, Louisiana # 12128, Shares 96, Registered holder: Bernice Harang Talbot, Date 09/08/86; (8) Argent Bank, Thibodaux, Louisiana, # AR 8187, Shares 2560; Registered holder: Bernice Harang Talbot, Date 11/15/95; (9)Argent Bank, Thibodaux, Louisiana, # AR 2180, Shares 1920; Registered holder: Bernice Harang Talbot, Date 11/15/95; (10) Banc One Corporation, "This Certificate is Transferable in New York, N.Y. or in Chicago, IL," # P178497, Shares 1, Owner Bernice E Harang Talbot, Date 3/6/96; (11) Banc One Corporation, "This Certificate is Transferable in New York, N.Y. or in Chicago, IL," # I252643, Shares 16, Owner Bernice E Harang Talbot, Date 1/31/96; (12) Banc One Corporation, "This Certificate is Transferable in New York, N.Y. or in Chicago, IL," # I365416, Shares 1, Owner Bernice E Harang Talbot, Date 3/6/96. From Mrs. Naquin's testimony, it was revealed that the banks in this case have been subject to mergers and buyouts. Hibernia bought out Argent Bank which had previously bought out Citizens Bank & Trust Company, so the stock certificates from Argent Bank and Citizens Bank & Trust Company are presently considered Hibernia Bank stock.
[12] The Uniform Stock Transfer Act at La. R.S. 12:6221 et seq. relied upon by the Court was repealed by 1978 La. Acts 165, § 6 and replaced with Chapter 8 of the Louisiana Commercial Laws (La. R.S. 10:8-101 et seq.). See La.Rev.Stat. Ann. §§ 10:8-101 et seq. (West 2003). This method of transferring stocks "supercedes the requirement that donations inter vivos be by authentic act." Fredrick William Swaim, Jr. & Kathryn Venturatos Lorio, 10 Louisiana Civil Law Treatise, Succession and Donations § 9.4, at 213 (1995).
[13] Another issue regarding Mrs. Talbot's stipulation of the community nature of the CDs does exist, but our discussion of the trial court's and appellate court's classification of the CDs pretermits discussion of this issue.
[1] See, Tullier v. Tullier, 464 So.2d 278, 281 & 283 (La. 1985) providing:

The intent of Article 2340 was to terminate the double declaration rule and to allow either spouse to prove the separate nature of property acquired during the community. [T]he legislature has concluded that the better policy would permit a spouse to prove in court the true nature of the property rather than to rely on the conclusive presumption fashioned by the Court ... Under the double declaration rule, property that may have been truly the separate property of the husband was arbitrarily presumed to be the property of the community absent the double declaration.
[2] Because Mrs. Talbot produced no evidence of the year of acquisition, this court should apply current law regarding the transfer of stock through inheritance. La. R.S. 12:603(C) provides that "evidence of an order of any court of competent jurisdiction ordering the transfer of shares to an executor or the judgment of any court of competent jurisdiction recognizing and putting such heirs or legatee in possession ... shall be full and sufficient authority for the making of said transfer."